UNITED STATES, Appellee

v.

James A. WISE, Private First Class
U.S. Army, Appellant

No. 06-0610

Crim. App. No. 20031310

United States Court of Appeals for the Armed Forces

Argued November 29, 2006

Decided April 24, 2007

BAKER, J., delivered the opinion of the Court, in which ERDMANN, J., joined.  EFFRON, C.J., filed a dissenting opinion.

STUCKY and RYAN, JJ., did not participate.

<u>Counsel</u>

For Appellant:  <u>Captain Sean F. Mangan</u> (argued); <u>Colonel John T. Phelps II</u>, <u>Lieutenant Colonel Kirsten V. C. Brunson</u>, <u>Lieutenant Colonel Steven C. Henricks</u>, <u>Major Charles L. Pritchard Jr.</u>, and <u>Major Billy B. Ruhling II</u> (on brief).

For Appellee:  <u>Captain Andrew C. Baum</u> (argued); <u>Colonel John W. Miller II</u>, <u>Lieutenant Colonel Michele B. Shields</u>, and <u>Captain Magdalena A. Acevedo</u> (on brief).


Military Judge:  James Pohl


**<u>THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION</u>.**

United States v. Wise, No. 06-0610/AR

Judge BAKER delivered the opinion of the Court.

Appellant was a private first class (E-3) serving with the 411th Military Police Company in Iraq. On December 16, 2003, he was convicted pursuant to his pleas by a military judge sitting alone of false official statements and wrongful use and distribution of controlled substances on divers occasions, in violation of Articles 107 and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 912a (2000), respectively. The military judge sentenced Appellant to a bad-conduct discharge, confinement for eight months, and reduction to grade E-1. The convening authority approved the bad-conduct discharge and grade reduction, but in accordance with a pretrial agreement only approved seven months of confinement. On February 2, 2006, the United States Army Court of Criminal Appeals summarily affirmed. United States v. Wise, No. ARMY 20031310 (A. Ct. Crim. App. Feb. 2, 2006). Upon Appellant's petition we granted review of the following modified issue:

> WHETHER APPELLANT'S CONFINEMENT CONDITIONS, INCLUDING AND IN PARTICULAR WITH RESPECT TO HIS CLAIM OF HAVING BEEN CONFINED WITH ENEMY PRISONERS OF WAR IN IRAQ, WERE UNLAWFUL, AND WHETHER, IN THE CONTEXT PRESENTED, APPELLANT FORFEITED HIS CLAIMS OF UNLAWFUL POST-TRIAL PUNISHMENT BY FAILING TO EXHAUST HIS ADMINISTRATIVE REMEDIES UNDER UNITED STATES V. WHITE, 54 M.J. 469 (C.A.A.F. 2001).

A prisoner must seek administrative relief prior to invoking judicial intervention to redress concerns regarding post-trial confinement conditions. United States v. White, 54

2

M.J. 469, 472 (C.A.A.F. 2001). Absent some unusual or egregious circumstance this means that the prisoner has exhausted the prisoner grievance system in his detention facility and that he has petitioned for relief under Article 138, UCMJ, 10 U.S.C. § 938 (2000). Id. For the case-specific reasons stated below, including Appellant's unrebutted statements regarding the nature of his confinement, his informal efforts to seek redress, and the unusual circumstances in which he was confined -- which according to Appellant included the absence of a formal grievance process -- we conclude that a review of Appellant's claims is warranted.

Turning to Appellant's allegation that he was detained with Iraqi enemy prisoners of war (EPWs) in violation of Article 12, UCMJ, 10 U.S.C. § 812 (2000), we conclude that even if the facts are as alleged by Appellant, based on the plain text and legislative history to Article 12, UCMJ, Appellant was not confined in "immediate association" with enemy prisoners or other foreign nationals.

Appellant also avers that he was placed in irons while confined in Iraq, in violation of Article 55, UCMJ, 10 U.S.C. § 855 (2000). Unlike the absolute proscription in Article 55, UCMJ, against flogging and branding, the proscription against the use of irons is qualified. Irons are permitted for the purposes of safe custody. As there may be well-founded reasons

for the use of irons in the combat situation presented, applying the principles of United States v. Ginn, 47 M.J. 236 (C.A.A.F. 1997), we are unable to resolve Appellant's claim without further fact-finding.  As a result, we remand this aspect of the case to the Court of Criminal Appeals, which is authorized to resolve the factual issue of why Appellant was confined in Tikrit with irons.  If the Court of Criminal Appeals orders further fact-finding, including a DuBay[1] hearing, and the convening authority determines that such fact-finding is impracticable, the convening authority may moot the issue and the necessity of further fact-finding by awarding Appellant a credit of twenty-one days for that period of time Appellant alleges in his unrebutted affidavit that he was confined in double irons in the Tikrit compound.

---

[1] Unites States v. DuBay, 17 C.M.A. 147, C.M.R. 411 (1967).

BACKGROUND[2]

During operations in Iraq, the 4th Infantry Division captured and detained a number of EPWs.[3]  According to Appellant's affidavits, at the time of his court-martial, 100 to 150 EPWs were being held in the 4th Infantry Division EPW confinement area in Tikrit, Iraq.  The confinement area, commonly referred to as "the cage," was not a structure but an area cordoned off by concertina wire, and further subdivided by concertina wire into at least two sections.  American soldiers, including Appellant, were assigned as guards and escorted the EPWs any time it was necessary to take them beyond the confines of the wired area.

Following his conviction, Appellant was ordered into confinement in "the cage" pending transfer to the confinement facility in Kuwait to serve the remainder of his sentence.

---

[2] Descriptions of Appellant's confinement are from two sworn affidavits Appellant executed in preparation for his appeal. There is no evidence or affidavits provided on behalf of the Government rebutting the information in these documents.  "Under these circumstances, we shall treat the statements in the documents as establishing the factual setting of the appellate proceedings."  United States v. Simon, 64 M.J. 205, 207 (C.A.A.F. 2006) (citing Ginn, 47 M.J. at 250).  This is in accord with the Supreme Court's view that "[s]olemn declarations in open court carry a strong presumption of verity."  Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).

[3] For the purposes of this opinion, we take Appellant's nomenclature as stated, and express no view as to whether the

Appellant and two fellow American soldiers were confined in a section separated from the EPWs by "a single strand of concertina wire." According to Appellant, he was close enough to the Iraqi EPWs for some of the EPWs to approach the dividing wire and attempt to engage the Americans in conversation. Appellant also states that one of the EPWs recognized him as a former guard, and that he recognized several of the EPWs as prisoners he had once guarded. Further, he states that two of the EPWs had tuberculosis and were quarantined from the others, but were separated from Appellant by no more than fifteen feet and one coil of concertina wire.

Appellant states that he was ordered to wear a blue jumpsuit, similar to the one worn by many of the EPWs. He also asserts that for the seven days he remained confined in "the cage," he was kept in "double irons" -- leg shackles and handcuffs -- even while eating and sleeping. The handcuffs were only removed when he was taken to the latrine.

After a week, Appellant was transferred to a confinement facility at Camp Arifjan, Kuwait, where he served the remainder of his sentence before returning to the United States.

Appellant argues that the conditions of his post-trial confinement violated his rights. In particular, with respect to

---

individuals referenced are appropriately referenced as EPWs, "other foreign nationals," or in some other manner.

his placement in irons, Appellant claims a violation of Article 55, UCMJ. With respect to his placement in proximity to the Iraqi prisoners, Appellant claims a violation of Article 55, UCMJ, and of his Eighth Amendment right to be free from "cruel and unusual punishment." See U.S. Const. amend. VIII.

DISCUSSION

This case poses two separate questions:

(1) Is Appellant barred from pursuing his claim by a failure to exhaust his administrative remedies while confined in Iraq?; and

(2) Was Appellant's incarceration in the enclosed confinement area in violation of his rights in that he was:

    a. Placed in immediate association with EPWS; or

    b. Placed in double irons for the extent of his stay in "the cage"?

## I. Exhaustion of Administrative Remedies

"[A] prisoner must seek administrative relief prior to invoking judicial intervention" to redress concerns regarding post-trial confinement conditions. White, 54 M.J. at 472; United States v. Miller, 46 M.J. 248, 250 (C.A.A.F. 1997) (quoting United States v. Coffey, 38 M.J. 290, 291 (C.M.A. 1993)). This requirement "promot[es] resolution of grievances at the lowest possible level [and ensures] that an adequate record has been developed [to aid appellate review]." Miller, 46 M.J. at 250.

We review factual findings under a clearly erroneous standard, but the "ultimate determination" of whether an Appellant exhausted administrative remedies is reviewed de novo, as a mixed question of law and fact. See, e.g., United States v. Anderson, 55 M.J. 198, 201 (C.A.A.F. 2001).

Exhaustion requires Appellant to demonstrate that two paths of redress have been attempted, each without satisfactory result. Appellant must show that "absent some unusual or egregious circumstance . . . he has exhausted the prisoner-grievance system [in his detention facility] and that he has petitioned for relief under Article 138." White, 54 M.J. at 472 (citation and quotation marks omitted); see also United States v. Lovett, 63 M.J. 211, 215 (C.A.A.F. 2006) (holding that in order to claim Eighth Amendment violations, the appellant must show, inter alia, "that he has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138") (citation and quotation marks omitted).

Article 138, UCMJ, provides that:

Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior officer, who shall forward the complaint to the commissioned officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a

8

> true statement of that complaint, with the proceedings
> had there on.

Since a prime purpose of ensuring administrative exhaustion is the prompt amelioration of a prisoner's conditions of confinement, courts have required that these complaints be made while an appellant is incarcerated. See, e.g., United States v. White, No. ACM 33583, 1999 CCA LEXIS 220, at *4, 1999 WL 605616 (A.F. Ct. Crim. App. July 23, 1999) (holding that solely raising conditions of confinement complaints in post-release clemency submissions is inadequate to fulfill the requirement of exhausting administrative remedies and that "after the appellant has been released from confinement . . . we have no remedy to provide"), aff'd, White, 54 M.J. at 475.

In the current case, there is no record of Appellant filing complaints about his confinement conditions while in "the cage," either through a prisoner grievance system or to his chain of command under Article 138, UCMJ. Even when Appellant was removed from the confinement area and transported to Kuwait, complaints regarding his confinement conditions in Iraq were still not raised. Pursuant to Rule for Courts-Martial (R.C.M.) 1105(b)(2)(D), Appellant submitted a clemency request on January 1, 2004, less than a week after his removal from the confinement area in Tikrit. In that request he did not reference the conditions in Tikrit. Appellant's counsel also did not raise

the matter in an additional clemency submission filed February 6, 2004.

However, Appellant states that he raised concerns about confinement early during the course of his legal proceedings. Appellant initially raised this issue immediately after his conviction and before his confinement. Worried that he would be incarcerated with the EPWs, Appellant spoke with his battalion commander about his concerns and the commander attempted to arrange for Appellant to be held in his unit area in Tikrit until he could be transferred to a confinement facility to serve his sentence. According to Appellant, his battalion commander's superior declined and ordered him into "the cage." Prior to incarceration, Appellant was also in contact with other representatives from his unit and his trial defense counsel, to whom he relayed his concerns. These attempts were also to no avail.

Appellant further claims that upon being placed in "the cage," he was given only a rudimentary in-processing, was denied contact with his attorney, and was provided no explanation of how to raise complaints. Appellant also claims that he had no knowledge of Article 138, UCMJ, procedures and further states that he did not believe that he had any way of raising his concerns while in "the cage."

10

The present record does not reflect that Appellant's command in Tikrit had an institutionalized complaint mechanism specific to the EPW confinement area, and Appellant's attempts to informally communicate with, and complain to, his guards were met with silence. On one of the few occasions that the guards responded to Appellant's concerns -- when Appellant raised his anxiety about being kept in close proximity to two EPWs who he was informed were suffering from tuberculosis -- the guards spurned his complaints. Additionally, notwithstanding the preference for raising the issue while undergoing the alleged onerous confinement conditions, in this case Appellant was kept under the complained-of conditions for only a week, limiting the possible time during which to complain.

Appellant also states that he attempted to lodge complaints about "the cage" as soon as he was afforded the opportunity to do so once he arrived at Camp Arifjan, Kuwait. He raised his complaints about his treatment in Iraq with the guard force supervisor at Camp Arifjan but was told that he could not use the Camp Arifjan complaint system to lodge an objection about his confinement in another location. Finally, less than a month after being released from confinement and returning to the United States, Appellant swore an affidavit that detailed the conditions he experienced in Iraq.

Based on the foregoing, we conclude that in the "unusual" circumstances presented, Appellant is entitled to have the merits of his claims addressed. Among other things, Appellant has asserted that he made numerous informal attempts to raise the conditions of his confinement in Iraq with his chain of command. Accepting Appellant's affidavits on their face, Appellant asserts that he was not briefed on, nor otherwise made aware of, any formal process of complaint at the facility in Tikrit during the first year of combat operations in Iraq. He further states that his efforts while confined in Kuwait to raise his concerns were brushed aside. The Government has chosen not to factually rebut Appellant's affidavits. Those allegations regarding confinement with EPWs and the use of leg irons are serious, raise matters of first impression for this Court for which there is no extant guidance, and are potentially subject to repetition during ongoing combat operations. In such circumstances, we conclude that unusual circumstances warrant review of Appellant's claims, notwithstanding his failure to exhaust those formal mechanisms of administrative review usually associated with permanent and established facilities.

In reaching this conclusion, we are cognizant that Appellant was represented by counsel. Further, defense counsel was sufficiently established in the operational setting presented to file for clemency using letterhead designated "U.S.

12

Army Trial Defense Service, Region IX, Tikrit Field Office, Tikrit, Iraq." Ordinarily, we would expect competent counsel to raise confinement concerns like Appellant's at the time they are brought to counsel's attention, or to indicate as part of the appellate record, why they were unable to do so in the context presented. These factors weigh in favor of a conclusion that Appellant did not exhaust his administrative remedies. Nonetheless, in our view, it factors into, but does not ultimately change, our conclusion that the better view is that unusual circumstances warrant consideration of Appellant's claims. In this regard we note the absence of guidance from this Court on the subject of exhaustion in an operational setting.

II. Did the Conditions of Confinement in Tikrit Violate Article 12, UCMJ, Article 55, UCMJ, or the Eighth Amendment?

We now examine the specific aspects of confinement about which Appellant complains. This Court reviews de novo the question of whether an appellant has been subject to impermissible conditions of post-trial confinement in violation of Article 55, UCMJ, and/or the Eighth Amendment. White, 54 M.J. at 471.

Appellant's initial grievance is that the conditions of confinement in Tikrit and then at Camp Arifjan, Kuwait, subjected him to conditions that did not meet the standards for

13

the incarceration of United States Army prisoners set out in the Dep't of the Army, Reg. 190-47, Military Police, The Army Corrections System (June 15, 2006) [hereinafter AR Reg. 190-47]. In this context, we find his complaints regarding his confinement in Kuwait without merit[4] and turn to the two issues that warrant review:  Appellant's claim of having been incarcerated in irons and his incarceration in proximity to enemy prisoners of war during the seven days in Tikrit.

    1.  Appellant's Incarceration with Iraqi Prisoners of War

    Article 12, UCMJ, provides:  "Confinement with Enemy Prisoners Prohibited[.]  No member of the armed forces may be placed in confinement in immediate association with enemy prisoners or other foreign nationals not members of the armed forces."[5] (emphasis added).

---

[4] AR. 190-47 is a 100-pluspage document detailing the Army corrections program, including the appropriate conditions of confinement for Army inmates.  The extensive list includes details ranging from the physical design of facilities to the provision of "health and comfort supplies" for prisoners.  Id. at para. 10-9.  However, the Army is provided explicit flexibility by a provision in the regulation for "field expedient detention cells," a provision that holds, inter alia, that "[d]etention cells used during field and combat operations will correspond to established . . . standards to the maximum degree possible under existing conditions."

[5] We note that para 3-2.e, of AR Reg. 190-47 tracks the language of Article 12, UCMJ:

      Incarceration with enemy prisoners of war.  Members of the Armed Forces of the United States will not be incarcerated in immediate association with enemy prisoners of war (EPW)

14

United States v. Wise, No. 06-0610/AR

Interpreting Article 12, UCMJ, is an issue of statutory interpretation, which we review de novo, United States v. Martinelli, 62 M.J. 52, 56 (C.A.A.F. 2005), as is the question whether Article 12, UCMJ, has been violated. The interpretation of Article 12, UCMJ, in this context is an issue of first impression.

A. Text of the Statute

The prohibition to which Article 12, UCMJ, is directed is not absolute in the sense that flogging or branding is proscribed in Article 55, UCMJ. Rather, the prohibition against "placing" American personnel in association with enemy prisoners or other foreign nationals is qualified by the nature of the association. Only "immediate association" is directly proscribed. Thus, the interpretation of Article 12, UCMJ, rests on an understanding of not just "association" but of the particular type of association to which the article is directed. Although the other terms in Article 12, UCMJ, are straightforward and can and should be read in light of their plain meaning and prior use in our case law, "immediate

---

or other foreign nationals not members of the Armed Services of the United States, unless the EPW or foreign nationals are being detained under military control for suspected or proven criminal conduct.

We conclude that the stated exception in AR Reg. 190-47 is inapposite in this case.

15

association" is subject to multiple interpretations.  See United

States v. Warner, 62 M.J. 114, 120 n.30 (C.A.A.F. 2005) (citing

Lamie v. United States Trustee, 540 U.S. 526, 536 (2004)).

There is no explanatory introductory paragraph in the

article that sheds light on the meaning or purpose of the

statute.  The few military cases that have used the term

"immediate association" have done so outside the context of

Article 12, UCMJ, analysis and are not on point.[6]  The dictionary

is only marginally more helpful.  The dictionary defines

"immediate" as "direct" or "proximate."  Webster's Third New

International Dictionary Unabridged (2002), available at

http://unabridged.merriamwebster.com (last visited Apr. 24,

2007).  "Association" is defined as the state of being

"connected" or "combine[d]."  Webster's Ninth New Collegiate

---

[6] This Court recognizes that the term "immediate association" has
been used in cases referring to Article 13, UCMJ, 10 U.S.C. §
813 (2000), and in particular when analyzing whether pretrial
inmates were inappropriately held with convicted prisoners.  In
that context, "immediate association" was synonymous with
"commingling."  See, e.g., United States v. Palmiter, 20 M.J.
90, 98 (C.M.A. 1985) (Everett, C.J., concurring in the result).
While informative, we find our use of the term in reference to
Article 13, UCMJ, inapposite in our discussions of Article 12,
UCMJ, for two reasons.  First, the understanding that the
prohibition on "commingling" is synonymous with "immediate
association" has become moribund as this Court has followed
civilian courts into looking at the intent of jailers, rather
than the physical placement of inmates, in determining
violations of Article 13, UCMJ.  See id. at 95 (majority
opinion).  Second, Congress only saw fit to place "immediate
association" in Article 12, UCMJ, suggesting that there were
special concerns that it wished to address in this regard.

16

Dictionary 110 (9th ed. 1991). Thus, it appears that Article 12, UCMJ, prohibits United States personnel from being confined in a manner so that they would be directly connected or combined with captured foreign personnel. Appellant contends that he was separated from Iraqi prisoners by only a "single strand of concertina wire." Yet, even a single strand of wire is not an insubstantial barrier and may have prevented Appellant's "connection" or "combination" with captured personnel. Concertina wire is high-strength, spring-steel wire with multiple barbs attached at short intervals. Field Fortifications, Subcourse EN0065, Edition B, United States Army Engineer School, Fort Leonard Wood, Missouri, Lesson 4, §4-5.a, available at http://www.globalsecurity.org/military/ library/policy/army/accp/en0065/le4.htm (last visited Apr. 24, 2007). Wires form coils so that when they are unrolled they take on a cylindrical shape akin to a concertina. See id. Persons handling concertina wire wear heavy reinforced gloves to avoid being cut by the wire. See id. §§ 4-2.6., 4-6. The standard concertina wire used by the United States military creates a cylindrical shape three feet in diameter. Id. § 4-5.a.

In our view, a single strand of concertina wire represents a real boundary between Appellant and foreign personnel. Nonetheless, the fundamental question remains: what sort of

17

United States v. Wise, No. 06-0610/AR

separation is mandated by Article 12, UCMJ?  With the text of the statute indeterminate, and in the absence of case law, we "turn to the primary source of the statute," its legislative history, for guidance.  Warner, 62 M.J. at 120 n.30.

   B.  Legislative History

   Unclear language can become clear if the congressional intent behind the legislation is reviewed.  See, e.g., United States v. Disney, 62 M.J. 46, 51 (C.A.A.F. 2005) (looking inter alia to legislative history to divine the purpose of a statute criminalizing the certain activities with explosive materials); United States v. Reeves, 62 M.J. 88, 93 (C.A.A.F. 2005) (invoking legislative history to understand the congressional purpose behind the Child Pornography Prevention Act of 1996); Loving v. United States, 62 M.J. 235, 241 (C.A.A.F. 2005) (relying on legislative history to glean the congressional intent behind Article 76, UCMJ, 10 U.S.C. § 876 (2000)).

   The legislative history surrounding Article 12, UCMJ, identifies the concerns it sought to address.  Article 12, UCMJ, stems from conditions of confinement experienced in World War II, a still-recent event when the UCMJ was debated in 1950. During that war the various military branches conducted two million courts-martial of United States personnel.  James B. Roan & Cynthia Buxton, The American Military Justice System in the New Millennium, 52 A.F. L. Rev. 185, 187 (2002).  Some

18

American servicemembers who had been convicted in these courts-martial had, at times, been held in prisons overseas with prisoners of war or other enemy nationals.  See Uniform Code of Military Justice:  Hearings on H.R. 2498 Before a Subcommittee of the House Committee on Armed Services, 81st Cong. 914-16 (1949), reprinted in Index and Legislative History, Uniform Code of Military Justice (1950) (not separately paginated) [hereinafter Legislative History].

The legislation from which Article 12, UCMJ, eventually derived was initially presented in the House of Representatives, as a part of the Selective Service Act directed to remediating the concerns about United States personnel being confined with foreign nationals during World War II.  According to testimony from Robert W. Smart, a professional staff member of the House Committee on Armed Services at the time, the article was originally "brought before the House [by] Mr. [Omar T.] Burleson of Texas [the previous year during debates on the Selective Service Act, with the sole goal ensuring] that American boys were not confined with prisoners of war or other enemy nationals," which Representative (Rep.) L. Mendel Rivers, the vice chair of the Committee stated "[often] happened during the war."  Id. at 914.  Language in line with Rep. Burleson's amendment was adopted in Article 16 of the Selective Service Act of 1948, which stated that American servicemen could not be

"confined with enemy prisoners or any other foreign nationals outside of the continental limits of the United States." Selective Service Act of 1948, Pub. L. No. 80-759, § 212, 62 Stat. 604, 630 (1948) (emphasis added).

However, once debate on the UCMJ commenced before the House Committee on Armed Services in March 1949, it became evident that the breadth of the article's language could create difficulties for military operations overseas. Felix Larkin, Assistant General Counsel in the Office of the Department of Defense, testified before the Committee and asserted that in many places "[t]here may not be more than one jail or place of confinement." Legislative History, supra, at 914. Thus, if prisoners of war or enemies were already incarcerated in the single facility, no American could be imprisoned with them, and vice versa.

Mr. Larkin and the Committee were especially concerned about this language as it pertained to the Navy. Id. at 914-15. If a naval vessel captured an enemy vessel at sea it may have been unable to incarcerate enemy sailors in the ship's brig if American sailors were already confined there. Id.

This concern led the Committee to propose and the Congress to adopt the "immediate association" language, which, according to Mr. Larkin, meant that "you could keep [American and foreign personnel] in the same jail [but had to] segregat[e] them in

different cells." Legislative History, supra, at 914. As the commentary to the proposed article stated, it was "intended to permit confinement in the same guardhouse or brig, but would require segregation." Id.

Appellant avers that he was held in a facility that also housed Iraqi prisoners of war. As he recounted, "[t]here were EPWs in the cage when I was housed there, although we were separated by a strand of concertina wire." Despite this barrier, the Iraqis were close enough for some of prisoners to attempt to engage Appellant in conversation and for one prisoner to recognize Appellant, and for Appellant to recognize many of his former prisoners. Moreover, for five of the seven days Appellant was as close as fifteen feet to two of quarantined Iraqis.

The situation in forward positions during combat -- as in the current case -- is not dissimilar from the hypothetical Navy ship at sea that has captured enemy sailors. In both cases, capacity to house prisoners may be limited and thus placing foreign and American prisoners in the same facility -- while ensuring some segregation -- is in line with the text as well as the spirit and history of Article 12, UCMJ. Indeed, the alteration of the text of Article 12, UCMJ, from the original seen in the Selective Service Act of 1948, reflects that Congress specifically intended to avoid designating situations

like the one in which Appellant found himself as per se violations of Article 12, UCMJ.

As Mr. Larkin testified in 1949, the drafters intended Article 12, UCMJ, to "prohibit incarceration in close association but not with because 'with' has the connotation that you could not keep them in the same prison and there may be only one." Legislative History, supra, at 915. The following testimonial exchange between Mr. Larkin and Rep. John Anderson further emphasized this point, expanding it to include both United States facilities and "foreign jails":

> MR. ANDERSON:  [I]s there any place in the code that expresses prohibition against confining our men in foreign jails?

> MR. LARKIN:  No; but this one prevents them being confined with enemy prisoners of war or foreign nationals not members in the same cell.

>     . . . .

> MR. ANDERSON:  [U]nder this code, could a commanding officer have an enlisted man . . . confined in a foreign jail?

> MR. LARKIN:  Yes, he could, for a short time or whatever time is necessary.  But if they are so confined they may not be in immediate association with any [foreign nationals].

Id.

In the only federal case in either the military or civilian systems directly addressing this provision, the United States Court of Appeals for the Tenth Circuit -- hearing a habeas

corpus claim -- came to the same conclusion, holding that the "heart of this prohibition [in Article 12, UCMJ] lies in the words 'in immediate association' and is not necessarily violated by the general confinement of the designated classes of prisoners within the same institution." Kuykendall v. Taylor, 285 F.2d 480, 481 (10th Cir. 1960).[7]

Based on this analysis, and assuming Appellant's statements as factually accurate, we conclude that Appellant's conditions of confinement while housed in the EPW "cage" did not violate his Article 12, UCMJ, rights.[8] See Ginn, 47 M.J. at 248 ("[I]f

---

[7] The appellant's Article 12, UCMJ, claim was one of several he lodged in his habeas claim, which centered on his mistaken belief that the Naval Reviewing Authority did not have the power to change the location of his confinement. Kuykendall, 285 F.2d at 480-81. While rejecting the entirety of his petition, the reviewing court could find no evidence that any foreign nationals were incarcerated in the same facilities in which he was imprisoned (initially the United States Naval Disciplinary Barracks, Naval Operating Base, Terminal Island, San Pedro, California, and then the United States Disciplinary Barracks at Fort Leavenworth), let alone "in immediate association" to the appellant. Id. at 481. Regardless, the court's view on the meaning of Article 12, UCMJ, while not binding, is persuasive and instructive.

[8] Applying Ginn, and assuming Appellant's affidavits are accurate, Appellant has not demonstrated that the conditions to which he was subjected were "sufficiently egregious" or amounted to unnecessary or wanton infliction of pain to give rise to the presumption that he was being impermissibly punished. Nor is there evidence that the Government intended to punish Appellant by confining him in "the cage" rather than a more formalized facility, or that the Government was "deliberately indifferent" to Appellant's well-being in doing so. As a result, we do not find Article 55, UCMJ, or the Eighth Amendment implicated in Appellant's placement in the confinement area in Tikrit. See

23

the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellee's favor, the claim may be rejected on that basis." Ginn, 47 M.J. at 248.)  The Government's segregation of Appellant from enemy prisoners and other foreign nationals was manifest and bona fide, and as a result, if indeed he was separated by concertina wire,[9] Appellant was not imprisoned in "immediate association" with foreign personnel.

   2.  Appellant's Incarceration in Irons

   According to Appellant's unrebutted affidavit, for the entirety of his incarceration in the EPW confinement area he was placed in double irons, i.e., handcuffs and leg cuffs.  His handcuffs were only removed when he was escorted to the latrine.

---

United States v. Fischer, 61 M.J. 415, 423 (C.A.A.F. 2005) (holding in the context of pretrial confinement that "sufficiently egregious" conditions can give rise to a presumption that a detainee is being punished citing United States v. James, 28 M.J. 214, 216 (C.M.A. 1989)); Palmiter, 20 M.J. at 95 (holding that improper intent by confinement officials can be determinative in finding violations of confinement conditions); Lovett, 63 M.J. at 216 (holding that an appellant must demonstrate that "officials knew and . . . disregarded known risks to inmate safety" in order to show a violation of the Eighth Amendment (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

[9] We reach this conclusion without expressing a view as to the relative merits in this and other contexts of the government's methods of complying with Article 12, UCMJ.  Indeed, in this case our decision is based not on the facts as adjudicated, but on one side's unrebutted affidavit examined consistent with Ginn.

These facts implicate Appellant's rights under Article 55, UCMJ,

which provides that:

> Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by any court-martial or inflicted upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited.

Emphasis added.

To have been permissible, the use of irons must have met

two criteria:  such use could not have been for punishment, and

the irons must have been employed to effectuate "safe custody."

Regarding the possible punitive use of the irons, this Court has

stated that "[I]n the absence of a showing of intent to punish,

a court must look to see if a particular restriction . . . ,

which may on its face appear to be punishment, is instead but an

incident of a legitimate nonpunitive governmental objective."

Palmiter, 20 M.J. at 95 (quoting Bell v. Wolfish, 441 U.S. 520,

539 n.20 (1979)) (alteration in original).  Further, as the

United States Court of Appeals for the Tenth Circuit held:

> Prison officials have wide discretion to determine what measures should be taken in order to preserve order and security in a detention facility. Determining [for example] that a particular inmate poses a security risk to fellow inmates and to corrections personnel [or to himself], and requiring that inmate to wear ankle and wrist restraints is certainly within this discretion.

Sanders v. Hopkins, 131 F.3d 152 (10th Cir. 1997) (table decision) (published in text format at 1997 U.S. App LEXIS 34179, at *6-*7, 1997 WL 7552776, at *2).

This Court has not addressed the meaning of "safe custody." Lower courts have found the use of irons appropriate when necessary to limit the potential risk of harm to an inmate or harm caused by an inmate, or to prevent a well-founded concern regarding escape. For instance, the United States Navy Court of Military Review found that leg irons were appropriately used for safe custody when they were placed on a known violent prisoner who had recently threatened an officer, and the prisoner was only constrained in such a manner for the duration of a two-hour transport flight. United States v. Ewing, 44 C.M.R. 738, 741 (N.C.M.R. 1971). Similarly, the United States Coast Guard Board of Review approved the use of leg irons on a prisoner who had escaped in the past and "showed . . . signs of [once again] going over the hill." United States v. St. Croix, 18 C.M.R. 465, 467 (C.G.B.R. 1955). The logic of Ewing and St. Croix is parallel to holdings in the civilian courts. See, e.g., LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993) (holding that keeping a known violent prisoner shackled and handcuffed even when showering was permissible so as to protect staff and fellow inmates); Selby v. Martin, 84 F. App'x 496, 498-99 (6th Cir.

26

2003) (holding that confinement in leg irons and belly chains was allowed for an inmate convicted of attempted escape).

Though the location of Appellant's confinement in Tikrit, Iraq, may have limited his escape risk, we are not provided any evidence of his propensity to abscond. Nor are we provided any evidence that the use of irons was necessary for safe custody. Such evidence is dispositive of an Article 55, UCMJ, violation regarding the use of irons, and once an appellant makes a colorable claim that he was put in irons, the burden for establishing that an exception to the statute's prohibitions were met falls to the government. In the context of an Article 13, UCMJ, claim, the appellant is experiencing the deprivations, or has experienced the deprivations, of which he complains and thus retains the burden of demonstrating the violative conditions. However, in this context, the information as to whether the irons were used as punishment or were used to effectuate "safe custody" is within the possession of the government.

As a result, on the present record before this Court we lack the necessary facts to determine whether the use of irons was necessary for "safe custody" and thus nonpunitive given the combat context presented. Such a finding "may justify [the] imposition of conditions and restrictions" without those conditions and restrictions becoming punitive. Bell, 441 U.S.

27

at 539-40 ("[I]f a particular condition or restriction . . . is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'").

## DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed as to the findings but set aside as to the sentence. The record of trial is returned to the Judge Advocate General of the Army for remand to that court. The Court of Criminal Appeals is authorized to resolve the factual issue of why Appellant was confined in Tikrit with irons. If necessary, that court may order a DuBay hearing. If the Court of Criminal Appeals orders further fact-finding and the convening authority determines that such fact-finding is impracticable, the convening authority may resolve the matter and moot the necessity for further fact-finding by awarding Appellant twenty-one days of confinement credit for that period of time Appellant alleges in his unrebutted affidavit that he was confined in double irons in the Tikrit compound. Following this action, Articles 66 and 67, UCMJ, 10 U.S.C. §§ 866, 867 (2000), shall apply.

United States v. Wise, No. 06-0610/AR

EFFRON, Chief Judge (dissenting):

Exhaustion of remedies is a critical component of litigation concerning the conditions of confinement. Our case law requires an appellant to demonstrate exhaustion of remedies absent unusual or egregious circumstances. See, e.g., United States v. White, 54 M.J. 469, 472-73 (C.A.A.F. 2001). As noted in the majority's opinion, the exhaustion requirement promotes two goals: (1) resolution of grievances at the lowest possible level; and (2) development of an adequate record for judicial review.

The record in the present case demonstrates that Appellant did not pursue the opportunities for relief that were available early in his period of confinement when he had the assistance of counsel. Further, the record does not establish the unusual or egregious circumstances that would excuse failure to exhaust under our case law. Under these circumstances, I respectfully dissent from the majority's decision to remand this case to the United States Army Court of Criminal Appeals for proceedings on the merits of Appellant's claim.

I.   BACKGROUND

A.  RECENT SUPREME COURT DECISIONS ON EXHAUSTION OF REMEDIES

Recent decisions by the Supreme Court confirm our reliance on the exhaustion doctrine, but call into question our practice

of placing the burden on the appellant to demonstrate exhaustion.

In Woodford v. Ngo, 126 S. Ct. 2378 (2006), the Supreme Court underscored the dual purposes of the exhaustion requirement in the context of the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) (2000).  First, exhaustion creates an incentive for resolution of claims at the prison level without resort to litigation.  Woodford, 126 S. Ct. at 2388.  Second, "exhaustion often results in the creation of an administrative record that is helpful to the court.  When a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved."  Id.

In Jones v. Bock, 127 S. Ct. 910, 919 (2007), the Supreme Court considered which party should bear the burden of proving exhaustion.  The Supreme Court concluded that failure to exhaust administrative remedies is an affirmative defense available to the government in civil litigation about prison conditions.  Id. at 921.  In that context, once a prisoner raises a claim of illegal punishment, the burden is on the government to prove failure to exhaust.  Id.

Although our prison condition litigation arises in a criminal rather than a civil context, we typically have looked

2

United States v. Wise, No. 06-0610/AR

to the Supreme Court's doctrine in such cases to guide the litigation of prison condition complaints in the military justice system.  See, e.g., United States v. Lovett, 63 M.J. 211, 215 (C.A.A.F. 2006) (relying on Farmer v. Brennan, 511 U.S. 825, 834 (1994), to allocate the relative burdens of the parties on the merits of a prison conditions claim).  Our practice of placing the burden on an appellant to prove exhaustion is a judicial doctrine, not specifically required by the Uniform Code of Military Justice or the Manual for Courts-Martial.  In light of the Supreme Court's decision in Jones, 127 S. Ct. at 921, it is not apparent why the prison condition litigation in the military should not place the burden on the government rather than on the defense to demonstrate a failure to exhaust available remedies.

  B.  THE CONVENING AUTHORITY'S POWER TO PROVIDE A REMEDY
         FOR ILLEGAL CONFINEMENT CONDITIONS

    The convening authority has broad power to provide relief for illegal confinement conditions imposed prior to the convening authority's action on the sentence under Rule for Courts-Martial (R.C.M.) 1107.  In the course of taking such action, the convening authority has broad discretion to disapprove the sentence in whole or in part, mitigate the sentence, or change the sentence as long as the severity of the punishment is not increased.  R.C.M. 1107(d)(1).  The requirement for post-trial action on the sentence provides an

3

opportunity to bring illegal confinement conditions to the attention of a responsible official, because the convening authority is obligated to consider "any matters submitted by the accused under R.C.M. 1105 or, if applicable, R.C.M. 1106(f)." R.C.M. 1107(b)(3)(A)(iii).

The defense counsel's obligation to serve the post-trial interests of his or her client includes a responsibility to ensure that appropriate sentence credits are applied against the sentence approved by the convening authority. See David A. Schlueter, Military Criminal Justice Practice and Procedure § 17-2(B)(7) (6th ed. 2004). As noted in Schlueter's treatise, "defense counsel should be prepared to file any written briefs or documentation that demonstrate accused's entitlement to a sentence credit. . . . [A]ny information about sentence credits should be transmitted to the convening authority at an early opportunity." Id.

The defense has multiple opportunities to present information about confinement conditions to the convening authority before the convening authority decides whether to approve the sentence. See R.C.M. 1105; R.C.M. 1106; Article 38(c), UCMJ, 10 U.S.C. § 838(c) (2000); United States v. Fagnan, 12 C.M.A. 192, 195, 30 C.M.R. 192, 195 (1961). See generally David A. Shaw, The Article 38c Brief:  A Renewed Vitality, Army Law., June 1975, at 26. Given this direct access to the

convening authority, defense counsel "bears a . . . [heavy]

burden of ensuring that the convening authority is aware of

those matters that indicate that clemency may be warranted."

Schlueter, supra, at § 17-8(B)(1).

C. DEVELOPMENT OF THE FACTUAL RECORD

1. Trial and post-trial proceedings (December 2003-March 2004)

a. The Appellate Rights Memorandum

Two days before his trial, Appellant signed and initialed a

memorandum documenting his post-trial rights.  Appellant

acknowledged that:

> I have the right to submit any matters I
> wish [sic] the convening authority to
> consider in deciding what action to take in
> my case. . . . If I have matters that I wish
> the convening authority to consider, . . .
> such matters must be submitted within 10
> days after I or my counsel receive a copy of
> the record of trial . . . .

b. Trial and Sentencing

On December 16, 2003, in Tikrit, a special court-martial

consisting of a military judge sitting alone adjudged the

sentence in Appellant's case.  The sentence included eight

months of confinement.

c. Appellant's Memorandum to the Convening Authority

On January 1, 2004, Appellant submitted a memorandum to the

convening authority requesting approval of an administrative

discharge or reduction of confinement to no more than four

months.  Appellant's request was typed on "United States Army

5

Trial Defense Service" letterhead, with the image of the Department of Defense symbol and the reply address of the Trial Defense Service.

In his two-page memorandum, Appellant admitted having made mistakes in his life, and accepted responsibility for the crimes he committed. He told the convening authority that he wrote the letter not to make excuses, but to ask for clemency. He described his difficult childhood and the abuse he suffered in foster homes. Appellant discussed his decision to join the military, and the happiness he found in the Army. Finally, he told the convening authority that he was ready to excel again in the civilian world, and that approval of his request for a post-trial administrative discharge or reduction of confinement would give him the head start he needed. Appellant concluded by thanking the convening authority for reading his letter.

The January 1 memorandum did not mention the conditions of Appellant's confinement. The memorandum did not indicate that he was incarcerated with enemy prisoners, that he was incarcerated in irons, or that he had any concerns about health, or safety, or improper treatment. Appellant did not indicate that he had any difficulty in contacting his lawyer or his unit during his incarceration.

   d.  The SJA's Post-Trial Recommendation

   The staff judge advocate (SJA) submitted the required post-trial recommendation under R.C.M. 1106 to Appellant's defense counsel on January 30, 2004.  The defense counsel acknowledged receipt the same day.  The SJA's post-trial advice recommended approval of the adjudged sentence except for any confinement in excess of seven months, as provided for in the pretrial agreement.

   e.  Defense Counsel's Submission to the Convening Authority

   On February 6, 2004, Appellant's defense counsel submitted post-trial matters to the convening authority "[p]ursuant to [R.C.M.] 1105 and 1106 and Articles 38(c) and 60."  The submission consisted of a two-page memorandum typed on "U.S. Army Trial Defense Service" stationary.  The memorandum included the Trial Defense Service Tikrit Field Office reply symbol and address in Iraq.

   Defense counsel's memorandum did not request any corrections to or changes in the SJA's post-trial advice.  The defense requested that the convening authority approve an administrative discharge or, in the alternative, disapprove any confinement in excess of four months.

   Defense counsel described Appellant's background and his efforts to become a good soldier.  The defense memorandum attached two stipulations of expected testimony from Appellant's

trial in which noncommissioned officers who knew Appellant

vouched for his ability to overcome his troubles.  Defense

counsel personally offered to discuss Appellant's case with the

convening authority, and listed his phone number at Forward

Operating Base Speicher in Tikrit, Iraq.

      f.  The SJA's Addendum and the Convening Authority's Action

      The SJA's Addendum to the post-trial recommendation, dated

March 7, 2004, acknowledged Appellant's R.C.M. 1105 and 1106

submissions, and adhered to the original recommendation.  The

convening authority acted that same day, approving Appellant's

sentence to confinement for seven months, reduction to Private

E-1, and a bad-conduct discharge.

2.  Proceedings before the Court of Criminal Appeals

      a.  Appellant's First Affidavit

      On August 9, 2004, while in the State of Texas, Appellant

signed a four-page affidavit, which he wrote "to accompany" the

appellate brief in his case.  The affidavit described his

conditions of confinement in Tikrit, Iraq, and Camp Arifjan,

Kuwait.  Appellate defense counsel included the affidavit as

Appendix A in the brief filed with the Court of Criminal

Appeals.

      The affidavit is the first document in the record in which

Appellant discusses the conditions of his confinement.  The

affidavit describes the first week after his sentence was

adjudged, in which he was confined in Tikrit, Iraq.  The affidavit stated that:  Appellant spent one week confined in Tikrit along with Iraqi prisoners; he was separated from the Iraqis by only a strand of concertina wire, and he was able to recognize some of the Iraqi prisoners as having been incarcerated previously with his unit; he was placed in handcuffs and leg irons the entire time he was incarcerated in Tikrit, even while eating and sleeping; he was housed approximately fifteen feet away from two Iraqi prisoners with tuberculosis for five days.  The affidavit stated that after one week in Tikrit, he was transferred to Camp Arifjan, Kuwait, where he spent the remainder of his seven month sentence in poorly ventilated conditions, oppressive heat, and unsatisfactory hygiene and dining facilities.  He was released in June 2004.

The affidavit does not mention any attempt on his part to talk with prison authorities or his defense counsel about his treatment in Tikrit or Kuwait.  The affidavit contains no claim that he was discouraged or prevented from complaining about the conditions of his confinement.  The affidavit contains no indication as to why he did not raise these matters to the convening authority or otherwise file a complaint during the period in which he had the active assistance of defense counsel in submitting post-trial matters.

   b.  Appellant's Brief to the Court of Criminal Appeals

Appellant's brief to the Army Court of Criminal Appeals alleged cruel and unusual punishment during his incarceration in Iraq and Kuwait.  The defense brief did not address the issue of exhaustion of administrative remedies, nor did the brief otherwise indicate why Appellant had not complained to military authorities requesting relief from the appellate courts.  The brief did not claim that trial defense counsel had been ineffective in his post-trial representation of Appellant.

   c.  The Government's Brief at the Court of Criminal Appeals

The Government's Answer at the Court of Criminal Appeals addressed Appellant's complaints of cruel and unusual punishment by asserting Appellant's failure to exhaust administrative remedies.  Appellant did not file a reply brief to the Court of Criminal Appeals and did not file a further affidavit at that court addressing the question of exhaustion.

   d.  The Decision of the Court of Criminal Appeals

The Court of Criminal Appeals affirmed in a summary disposition.

3.  Further appellate proceedings

   a.  The Petition for Review

Appellant sought a grant of review under this Court's discretionary jurisdiction, Article 67(a)(3), UCMJ, 10 U.S.C. § 867(a)(3) (2000).  In his petition supplement, Appellant

requested that we grant review of a single issue, whether his
confinement conditions constituted cruel and unusual punishment
under Article 55, UCMJ, 10 U.S.C. § 855 (2000), and the Eighth
Amendment to the Constitution.  The Government filed a letter
response attaching its brief before the Court of Criminal
Appeals in which it argued that Appellant had failed to exhaust
his administrative remedies.  Appellant did not address
exhaustion in his petition supplement, and did not file a reply
to the Government's submission.

   b.  The Grant of Review

On August 15, 2006, this Court granted review of a modified
issue, asking whether Appellant's confinement conditions were
unlawful, and "whether, in the context presented, Appellant
forfeited his claims of unlawful post-trial punishment by
failing to exhaust his administrative remedies."

   c.  Appellant's Second Affidavit

On September 21, 2006, Appellant wrote and signed an
affidavit that, for the first time, addressed exhaustion of
administrative remedies.  The affidavit stated that he had not
had any contact with his unit or anyone else during the week
following December 16, 2003, in which he was confined in Tikrit.
He stated that he had not received normal in-processing in
Tikrit, and was not informed how to contact an attorney or how
to raise concerns and complaints.  He stated that when he tried

to speak with American personnel he was ignored.  He added that after he arrived at the confinement facility in Kuwait he was allowed to file complaints and raise concerns about the Kuwait facility, but was told that he could not complain about the conditions in Tikrit because it was a different facility.  He further stated that he did not receive any explanation about the Article 138, UCMJ, 10 U.S.C. § 938 (2000), grievance process, and that he did not know what it was, how it worked, or how he could use it to address his treatment in confinement.

The affidavit makes no mention of his submission to the convening authority on January 1, 2004, a week after he completed his confinement in Tikrit, nor does the affidavit address the representation he received from his defense counsel over the next two months.  The affidavit offers no explanation as to why he did not request relief from the convening authority in his post-trial submission during the period in which he was receiving legal representation by trial defense counsel on post-trial matters.

The brief filed by appellate defense counsel likewise is silent on these matters.  Appellant has not addressed his failure to request redress during the period in early 2004, immediately following his time in the Tikrit facility, in the context of the direct communications that he and counsel were having with the convening authority.  The defense brief makes no

claim that combat, field, or operational conditions facing Appellant and his counsel restricted communications between counsel and client, or otherwise inhibited the filing of a complaint during the two-month period following his time in the Tikrit facility when counsel and client were communicating with the convening authority. The defense brief makes no claim of ineffective assistance of counsel either with respect to the submissions to the convening authority or with respect to preserving Appellant's rights by seeking redress under Article 138, UCMJ, or otherwise.

## II. DISCUSSION

The primary focus of the present case is Appellant's confinement in Tikrit during the week after his December 16, 2003, court-martial. The record demonstrates that in the two-month period following his confinement in Tikrit, Appellant had access to counsel, communicated with counsel, and submitted requests for sentence relief to the convening authority while he was incarcerated. Appellant's brief does not explain why he failed to request that the convening authority provide him with sentence credit for illegal confinement, or why he did not have an adequate opportunity to utilize the assistance of counsel in obtaining redress. Since his release from confinement, Appellant has not asserted that operational conditions or any

13

other circumstances inhibited his communication with counsel during the period in which the defense was making submissions to the convening authority. He has not asserted that his defense counsel was ineffective for failing to inquire about or pursue the conditions of his post-trial confinement.

The record demonstrates that Appellant had a clear opportunity to seek relief during the period immediately following his confinement in Tikrit when he was in communication with defense counsel and the convening authority. The record does not contain an adequate explanation for Appellant's failure to do so during that period. A request for relief at that time would have provided the opportunity to create an appropriate administrative record of his confinement conditions. As the Supreme Court recently observed in Woodford, 126 S. Ct. at 2388, witnesses could have been identified and questioned while memories were still fresh, and evidence could have been gathered and preserved.

Under these circumstances, whether the burden falls on Appellant or on the Government, the record demonstrates that Appellant's claim does not meet the exhaustion of remedies requirement. In that posture, it would be inappropriate to provide Appellant with the opportunity to create the record now that could have been created near the time of his incarceration in Tikrit. Further inquiry into the merits of the claim is

14

unwarranted.  Accordingly, I respectfully dissent from the majority's decision to remand this case for further proceedings on the merits of Appellant's claim.